DANIEL O'CONNELL'S SONS, INC. *vs.* COMMONWEALTH.

Suffolk. October 6, 1965. — December 2, 1965.

Present: SPALDING, WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Contract,* Building contract.

Certain provisions of a contract with the Commonwealth for construction of a highway bridge over a stream precluded the contractor from relying on the accuracy of data furnished by the Commonwealth and placed on him the responsibility of determining for himself "all conditions affecting" his work, and where it appeared that he, nevertheless relying

on the depth of excavation shown on the Commonwealth's plans as necessary to reach solid ledge for the footings of the bridge, decided upon a simple earthen cofferdam as a water control without objection by the Commonwealth's engineer, but a substantially greater depth of excavation turned out to be necessary to reach solid ledge so that the earthen cofferdam was inadequate and he was required by the engineer to contruct a steel sheeted cofferdam at additional expense, he was not entitled to payment of the additional expense under a provision of the contract for payment in certain circumstances for extra work done by reason of "change in depth of foundation . . . directed by" the engineer.

PETITION filed in the Superior Court on March 6, 1962.

The case was heard by *Cahill, J.*

*John F. Moriarty* for the petitioner.

*Edward A. Roster,* Special Assistant Attorney General, for the Commonwealth.

KIRK, J. This is a petition under G. L. c. 258, §§ 1 and 2, to establish the petitioner's right to damages as the result of costs incurred for alleged extra work in the performance of a road building contract with the Commonwealth. In the Superior Court the case was referred to an auditor who found for the petitioner (contractor). Thereafter the case was heard by a judge who, upon the auditor's report and other evidence, made findings of fact and an ultimate finding for the Commonwealth. The judge reported the case to us with two questions for our determination.

We set out certain facts, mainly uncontroverted, which appear in the judge's report. The contract with the Commonwealth, executed on April 21, 1959, called for the contractor to build a two mile stretch of highway in Greenfield and Bernardston at a cost of more than $2,000,000. The project included the construction of a bridge over a stream in Bernardston. This involved the excavation of the riverbed for pier construction.

Several provisions of the "Standard Specifications for Highways and Bridges" (specifications),[1] incorporated into the contract, related to the building of cofferdams. Thus, Article A3.30 D of the specifications provided, in

---

[1] The specifications comprised a printed volume of 500 pages.

part: "The Contractor will be required to construct suitable cofferdams for the foundation work whenever the nature of the work requires them. Before starting this work the Contractor shall submit for comment by the [Commonwealth's] Engineer sketches and details of the cofferdam construction he proposes to use. The full responsibility for their safety and construction will rest with the Contractor. Each cofferdam shall be sufficiently tight to prevent the flow of water through the area in which the work is to be done, and shall be built to adequate strength to withstand all pressures to which it may be subjected. The top of the cofferdam shall be sufficiently above the water to prevent flooding the interior by any reasonable rise in elevation of the water during the use of the cofferdam. The bottom of the cofferdam shall be a sufficient depth below the proposed foundation grade to permit a reasonable change (at least 2 feet) in depth of the foundation within the cofferdam, if directed."

Article 4 provides: "Statements as to the condition under which the work is to be performed, including plans, surveys, measurements, dimensions, calculations, estimates, borings, etc., are made solely to furnish a basis for comparison of bids, and the . . . [Commonwealth] does not guarantee or represent that they are even approximately correct. *The Contractor must satisfy himself by his own investigation and research regarding all conditions affecting the work to be done and labor and materials needed, and make his bid in sole reliance* thereon" (emphasis supplied).

The geological data provision states: "An interpolated line, purporting to show boulder or rock obstruction, is plotted on the cross-sections where limited geologic data based on seismic explorations or punchings indicate such obstructions. These lines are in no way guaranteed by the Department as truly representative of existing conditions. The seismic data shown on the plans was taken for design purposes only and may not represent materials actually encountered during construction. This information is avail-

able for the bidders to see at Room 640, Department's Main Office at 100 Nashua Street, Boston, Mass. *Any reliance placed on such information will be solely at bidders risk. The bidder shall have no redress against the Department for any loss sustained if his prosecution of work or submission of his bid prices are based, on this data"* (emphasis supplied).

Item A3–5 of the contract obliged the contractor to avoid causing "boiling or other disturbance of the ground in the foundation area," and to use such means of excavation as would prevent water seepage. It also provided that "[t]he contract price for Bridge Excavation shall include full compensation for whichever means are required to attain the foregoing requirements."

Although, under Item A3–5 of the contract, a unit price covered all means employed for bridge excavation, Article A3.41 of the specifications provided, in part, for payment above the unit price for extra work in the following language: "If any change in depth of foundation or in other dimensions of the foundation is directed by the [Commonwealth's] Engineer after the controls have been provided, and if such change is greater than can be accommodated by the controls as constructed by the Contractor with the approval of the Engineer, then any changes made as directed by the Engineer will be paid for in accordance with the contract provisions for Extra Work."

The judge found that the contractor began construction of piers for the bridge over the stream in August, 1959. The plans of the Commonwealth indicated that solid ledge would be reached about two feet below the stream bed which the Commonwealth plotted at elevation 319.4 and that a westerly pier at elevation 311 and an easterly pier at elevation 312.5 were to be constructed. Based on these figures, excavations of about 8.4 feet on the westerly side and 6.9 feet on the easterly would be necessary. These figures were relied upon by the contractor in preparing his bid. He chose to control the waters by means of a simple earthen cofferdam to permit excavation.

The judge found that, from the beginning of the coffer-dam construction, the Commonwealth's engineer was at the site at least once and sometimes twice daily. The engineer knew of the contractor's plans and intentions for water control and observed the installation and construction of those controls. He never objected to the methods employed by the contractor or to the manner in which the work was being carried out.

After work had begun, the contractor discovered that ledge was more than two feet beneath the bed, and that additional methods of control were needed. He thereupon dredged the bed of the stream and lowered the headgates of a downstream dam at a cost of over $6,000. (The contractor seeks no extra compensation for this expenditure.)

Despite the additional methods of control undertaken by the contractor, it became clear that the westerly pier required four more feet of excavation before ledge would be encountered. The contractor's representative and three of the Commonwealth's engineers, namely, the resident engineer and two of his superiors, conferred at the site of the bridge and decided that the earthen cofferdam and other controls were inadequate to meet the change in the depth of the excavation. The engineers then directed the contractor to install a steel sheeted cofferdam. The contractor's superintendent said that the contractor would be entitled to ''extra compensation'' for the installation. The engineers told him to keep a separate account of his costs for the installation, and said that they would discuss the extra charge at a later date.

The footings for the two piers as finally constructed were, on the westerly side, at elevation 307 and, on the easterly side, at elevation 309.3. The excavations were, respectively, 4 feet and 3.2 feet greater in depth than had been originally plotted.

The contractor incurred costs attributable to the construction of the steel sheeted cofferdam at the direction of the engineers amounting to $12,030.14.

The Commonwealth refused to pay the alleged extra costs, and, in consequence, the petition was brought. In

addition to the findings already stated, the judge found that "the earthen cofferdam methods originally employed by the . . . [contractor] were not economically feasible, nor were they adequate to provide the dry working area necessary under the original specifications." The judge found for the Commonwealth.

We need discuss only the first question reported by the judge, since the answer to it is decisive of the case. *Weiner* v. *D. A. Schulte, Inc.* 275 Mass. 379. The question was: "Whether on the foregoing facts the petitioner is entitled by the provisions of Article A3.41 of the Standard Specifications to recover the costs incurred by it in the construction of the steel sheeted cofferdam in accordance with the contract provisions for Extra Work."

The findings clearly show that the contractor relied upon geological data provided by the Commonwealth, despite the Commonwealth's express disclaimer of responsibility for the accuracy of the data, and the provision that "the Contractor must satisfy himself by his own investigation and research regarding all [such] conditions." Specifically, the original decision to use an earthen cofferdam to control the waters was the contractor's alone. No responsibility for it was shared by the Commonwealth. The decision of the contractor was made in ignorance of ascertainable geological data which he had the duty to establish, namely, the depth to the ledge below the stream bed. The discovery during the construction of the earthen cofferdam of the actual depth demonstrated that the cofferdam was inadequate chiefly because the contractor had failed to determine, by his own investigation and research, the location of the ledge. The subsequent direction by the engineers to build a steel sheeted cofferdam did not entitle the contractor to payment for extra work under Article A3.41, but merely required him to perform his part of the contract as provided in Article A3.30 D of the specifications.

The contractor's case is not strengthened because the resident engineer was daily at the site, was aware of the contractor's plans, and made no objection. Whatever the

plans were, they rested upon an error of fact concerning the depth to ledge which the contractor had the exclusive responsibility to establish. See *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190, 199.

The answer to the quoted question is: No. Judgment must be entered for the respondent.

*So ordered.*